**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Joseph MORSE, Defendant–Appellant.**

No. 86–3693.

United States Court of Appeals,
Eleventh Circuit.

Aug. 10, 1988.

---

Peter J. Grilli, Alpert, Jorey, Grilli, Paris & Hanna, P.A., Tampa, Fla., for defendant-appellant.

Robert W. Merkle, U.S. Atty., Whitney L. Schmidt, Asst. U.S. Atty., Tampa, Fla., Shelley A. Longmuir, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before ANDERSON and EDMONDSON, Circuit Judges, and ATKINS\*, Senior District Judge.

EDMONDSON, Circuit Judge:

This appeal challenges the sufficiency of the evidence to support defendant-appellant Joseph Morse's convictions for conspiracy to possess with intent to distribute marijuana (21 U.S.C. secs. 841(a)(1) & 846) and for conspiracy to import marijuana (*id.* secs. 952(a) & 963). That Morse sold a Beechcraft Queen Aire plane to people who used the plane to smuggle marijuana into the United States is undisputed. The only issue is whether the evidence, viewed in the light most favorable to the Government, supports Morse's conspiracy convictions.[1] *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Finding sufficient evidence, we affirm the district court's judgment of conviction.

BACKGROUND

The evidence at trial revealed that several people, including David Cauthen and Ray Colding,[2] conspired to smuggle marijuana into the United States. They needed a small, private plane to carry out their plan. Cauthen approached Morse and asked about purchasing Morse's Beechcraft Queen Aire.[3] Together, Cauthen and Morse went to view the plane: the plane had no passenger seats, leaving room to haul marijuana.[4] Morse said that he would sell the plane for $80,000. Then, Cauthen said that he would like to show the plane to someone else, and Morse agreed.

Several days later, Colding and Cauthen met Morse to view the plane and to discuss

---

\* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

1. Morse seemingly criticizes the Government prosecutor for making a remark during closing argument that supposedly was "improper and prejudicial." Yet Morse has not shown how this remark was improper or prejudicial; we reject this "contention" without further discussion.

2. At trial, Colding testified that he and Cauthen had been friends since they were young boys, and that they had smuggled and distributed marijuana for years.

3. Cauthen testified that he knew Morse even before the plane transaction occurred: "My girl friend and his wife are good friends and I met him out at Pilot Country Estates [where the plane was located] one time, several times."

4. Cauthen may have never told Morse what the plane would be used for. Still, Cauthen testified that "my intent was, hopefully, that it would be used, you know, to bring in some pot [marijuana]."

its purchase. Still later, Colding again contacted Morse; and they discussed a purchase price: Morse raised the price from $80,000 to $115,000. They also discussed the terms of payment: Colding offered to pay approximately ten percent down ($15,-000) with the balance to be paid within thirty days. Morse agreed to this arrangement. So, Colding, who was twenty-three years old, gave Morse $15,000 in cash of small denominations and received the keys to the plane. Colding received no receipt and no registration papers to document the transaction; and the parties signed no contract, bill of sale, or other writing.[5]

Colding and several other persons then used the plane to smuggle marijuana from Mexico to Texas. The plane was abandoned in Texas. Federal authorities confiscated the plane and attempted—without success—to obtain the name of the last titled owner.[6]

Colding then returned to Florida and met Morse. Colding told Morse that he (Colding) would not be able to pay the balance of the purchase price ($100,000) within the agreed-upon, thirty-day period. As Colding later testified, "I told him [Morse] that what I had done with the airplane is let some friends of mine take it and they, in fact, smuggled marijuana in it and ripped me off and was not going the pay me." (sic). According to Colding, Morse was "very disturbed" by the news: "He just— he was, you know, I had not the money or the airplane. I had not stood up to what I

had promised to do." Eventually, over a period of six months, Colding paid Morse approximately $65,000 in cash, in addition to the $15,000 previously paid as a down payment. Morse never threatened to call the authorities about the drug smuggling, and he never threatened to pursue any legal avenues to obtain the balance of the purchase price.

## SUFFICIENCY OF THE EVIDENCE

Morse challenges the sufficiency of the evidence to support his conspiracy convictions. Such a challenge implicates the *Glasser* standard:

> We must view the evidence in the light most favorable to the government, accepting all reasonable inferences which support the verdict, ... and affirm the conviction if a reasonable trier of fact could conclude that the evidence establishes guilt beyond a reasonable doubt.... The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except guilt.... The jury is free to choose among reasonable constructions of the evidence.

*United States v. Meester,* 762 F.2d 867, 881 (11th Cir.1985) (citations omitted). In this case, the Government prosecuted Morse for conspiracy to import and to distribute marijuana based upon his sale of the plane.[7]

The circumstantial evidence in this case adequately supports Morse's conspiracy convictions. First, the plane in Florida that Morse sold to Colding was particularly suit-

---

5. The intended use of the plane—to smuggle marijuana—was apparently not discussed. At trial, Colding testified that "[the plane marijuana deal] just never was brought up at that point."

6. At trial, the evidence showed that, at the time, the last registered owner of the plane was "Central Flying Service" of Nashville, Tennessee, which registered a purchase of the plane with the Federal Aviation Administration (FAA) in 1978. This registration is required by law. Neither Morse nor Colding ever registered their purchases of the plane.

7. Morse cites *United States v. Bertram,* 805 F.2d 1524 (11th Cir.1986), for the proposition that "[t]o convict a supplier of goods of conspiracy it must be shown (1) that the seller knew that the buyer intended to use the goods illegally and (2) that the seller intended to promote the illegal

enterprise." *Id.* at 1531. The *Bertram* standard is met here. Still, as we further discuss, Morse's role in this marijuana smuggling conspiracy went beyond that of a mere "supplier of goods." *Cf. id.* at 1531-32 (defendant, a chemist, was convicted for selling his products to "clandestine drug manufacturers"; conspiracy conviction upheld on appeal); *Direct Sales Co. v. United States,* 319 U.S. 703, 708-13, 63 S.Ct. 1265, 1268-70, 87 L.Ed. 1674 (1943) (defendant convicted for selling restricted narcotics; conspiracy conviction upheld on appeal); *United States v. Falcone,* 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940) (evidence insufficient to support convictions for aiding and abetting a conspiracy to distill spirits of persons who knowingly supplied a large volume of sugar and yeast to illegal distributors).

ed for smuggling: there were no passenger seats in the plane, leaving more room for hauling marijuana; one witness—a customs agent—testified that "a Beechcraft Queen Aire happens to be one of the profile aircraft that is involved in narcotic smuggling." Second, Morse sold the plane for $115,000, almost twice its market value;[8] he had raised the price from $80,000 after meeting with Cauthen and Colding. Third, all payments were made in cash of low denominations. Fourth, Morse sold the plane to Colding, a twenty-three year old, without any contract or receipt to evidence the transaction. Fifth, Morse, who never had registered *his* purchase of the plane with the Federal Aviation Administration (FAA), sold the plane without providing the FAA with an aircraft registration application or bill of sale as required by law. Sixth, Morse was informed that the plane had been used to smuggle marijuana; yet he made no attempt to contact law enforcement officials. Seventh, when Colding failed to pay the balance of the agreed purchase price, Morse did not threaten to file suit to recover the money.

Morse nonetheless argues that, because no direct evidence links him to the conspiracy, there is insufficient evidence to support his convictions.[9] We disagree: Direct evidence is unrequired; circumstantial evidence is enough. *Meester*, 762 F.2d at 881. To support a conviction for conspiracy, "[t]he government need not prove that the defendant had knowledge of all details or phases of the conspiracy. Rather, it will suffice to show that the defendant knew the essential nature of the agreement." *Meester*, 762 F.2d at 881. Furthermore, "[a] defendant's knowing participation in the conspiracy may be established by proof of acts committed by him that furthered the purpose of the conspiracy." *Id.*

While it is true that the sale of an airplane, in and of itself, may be consistent with innocence, the circumstances of this case go beyond that and support Morse's convictions for conspiracy. *See United States v. LaChance*, 817 F.2d 1491, 1494 (11th Cir.1987) ("The fact that [defendant's] acts appeared not to be illegal when viewed in isolation does not bar his conviction. 'An act innocent in nature and of no danger to the victim or society suffices if it furthers the criminal venture.'"). As we noted *supra*, Morse sold a plane (at almost twice its market value) suitable for drug smuggling to a young man (Colding) whom he had never previously met; there was no documentation, as required by law, to accompany the transaction; all of the payments were in cash; and Morse was in fact informed of the marijuana smuggling operation (albeit after its accomplishment) and did nothing to aid the authorities.

From the circumstances, a jury could infer that Morse knew about and participated in the conspiracy. A jury could find that an excessive sales price was demanded and agreed to not just to make the cargo plane available, but to make it available secretly, for example, without the paperwork that customarily and properly accompanies a transfer for lawful purposes. A jury could also find that Morse—by accepting a relatively small down payment with the large remainder to be paid in the future and taking no security for the full payment and no documentary evidence of the debt—undertook to share with Colding the economic risk that accompanies a drug smuggling operation.

Accordingly, we AFFIRM.

---

**8.** Several witnesses at trial estimated the value of the airplane to be between $50,000 and $70,000.

**9.** Morse relies upon two cases that involved the sale or use of a plane to smuggle drugs. *See United States v. LaChance*, 817 F.2d 1491 (11th Cir.1987); *United States v. Burchinal*, 657 F.2d 985 (8th Cir.1981). In both cases, defendants' convictions were affirmed on appeal. Although these cases may have involved different, more compelling and damaging evidence than the present case, neither *LaChance* nor *Burchinal* requires that we set aside Morse's convictions.