**UNITED STATES of America,**

v.

**Victor TORRES, a/k/a "Victor Torres Lebron," Jorge Torres, a/k/a "Jorge Torres Lebron," Nelson Flores, Ray Coffie, a/k/a "Meno," Dennis Rivera, Reginald Velez, a/k/a "Reggie," et al., Defendants.**

**No. S 87 Cr. 593 (JMW).**

United States District Court, S.D. New York.

Sept. 23, 1988.

See also, 683 F.Supp. 56.

Gerald Shargel, New York City, for Victor Torres.

Eli Cohen, Robert I. Lesser, New York City, for Ray Coffie.

Helen Gredd, Catherine Gallo, Asst. U.S. Attys., for the Government.

Gary Becker, Gerald Lefcourt, New York City, for Nelson Flores.

Thomas Nooter, Freeman, Nooter & Ginsberg, New York City, for Reginald Velez.

William Mogulescu, Lewinson Mogulescu & Kaplan, New York City, for Efrain Arcelay.

Robert Ellis, New York City, for Jesus Santiago.

Thomas White, New York City, for Louis Rivera.

Michael Ross, LaRossa, Mitchell & Ross, New York City, for Jorge Torres.

Michelle Jacobs, New York City, for Fernando Padron.

Zoilo P. Silva, College Point, N.Y., for Dennis Rivera.

Maurice Sercarz, Sercarz, Schecter & Lopez, Brooklyn, N.Y., for Natalie Vazquez.

Jack Lipson, New York City, for Rosa Flores.

Roger Adler, New York City, for Pedro Cruz.

Benicio Sanchez, Puerto Rico, for George & Victor Torres.

## AMENDED OPINION

WALKER, District Judge:

This narcotics case was tried to a jury over 33 trial days and resulted in guilty verdicts on July 6, 1988, as to 12 defendants. Before the Court are post-trial motions of six defendants: Victor Torres, Jorge Torres, Nelson Flores, Ray Coffie, Dennis Rivera, and Reginald Velez. For the reasons stated below, all the motions are denied.

The motions may be divided into two categories. First, in what the Court believes to be an issue of first impression in this Circuit, defendants Victor Torres, Jorge Torres, and Nelson Flores claim that the mandatory sentence of life imprisonment without parole, mandated by 21 U.S. C. § 848(b), violates the Eighth Amend-

ment's ban against cruel and unusual punishment and violates the due process clause of the Fifth Amendment. Second, defendants Victor Torres, Jorge Torres, Nelson Flores, Ray Coffie, Dennis Rivera, and Reginald Velez move for acquittal on one or more counts pursuant to Fed.R.Crim.P. 29(a); in the alternative, defendants Nelson Flores and Ray Coffie also move for a new trial under Fed.R.Crim.P. 33. These motions will be addressed in turn.

### Constitutionality of Sentence Under 21 U.S.C. § 848(b)[1]

■ Victor Torres, Jorge Torres, and Nelson Flores challenge the constitutionality of the sentence imposed under 21 U.S.C. § 848(b). Specifically, they contend that life imprisonment without the possibility of parole violates the Eighth Amendment to the Constitution. These defendants also argue that the sentence, as applied to them, violates the due process clause of the Fifth Amendment. After careful consideration of these issues, the Court denies the defendants' motions.

The Eighth Amendment proscribes "cruel and unusual punishment."[2] The Supreme Court has held that the Eighth Amendment is infringed only when the penalty is "grossly disproportionate to the severity of the crime." The Court has also emphasized that when cases other than those involving the death penalty are considered, holdings of unconstitutionality "have been exceedingly rare." *Rummel v. Estelle,* 445 U.S. 263, 271–72, 100 S.Ct. 1133, 1137–38, 63 L.Ed.2d 382 (1980); *So-*

*lem v. Helm,* 463 U.S. 277, 284–290, 103 S.Ct. 3001, 3006–3010, 77 L.Ed.2d 637 (1983). It is true, as defendants contend, that the principle of proportionality is applicable to prison terms. *Solem,* 463 U.S. at 288–90, 103 S.Ct. at 3008–10. Nevertheless, this Court is convinced that this case in not one of those "exceedingly rare" instances in which the penalty is "grossly disproportionate" to the crime committed.

In its recent opinion of *Solem v. Helm,* the Supreme Court enunciated several factors that a court should consider in determining whether a sentence of imprisonment violates the Eighth Amendment. Paramount among those concerns is the "gravity of the offense and the harshness of the penalty." *Id.* at 290–91, 103 S.Ct. at 3009–10. The Court also suggested two other areas of inquiry that courts *may* find instructive in assessing the constitutionality of a prison term: a comparison to both the "sentences imposed on other criminals in the same jurisdiction" and "the sentences imposed for commission of the same crime in other jurisdictions."[3] *Id.* at 291–92, 103 S.Ct. at 3010–11. The Court emphasized that objective factors must be employed in the analysis lest the judiciary improperly intrude on the role of the legislative branch, and reviewing courts were instructed to "grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes ..." *Id.* at 290, 103 S.Ct. at 3009.

---

**1.** In a pretrial opinion in which the Court held that the language of § 848(b) was neither arbitrary nor vague, the Court declined to address the constitutionality of the mandatory sentence under § 848(b) since the issue was unripe. Because of the conviction of the defendants under this provision and the requirement that the Court sentence them thereunder, the issue is currently ripe and properly before this Court.

**2.** The Court notes that many of the arguments made by the Torres brothers and Nelson Flores address the *wisdom* of life imprisonment without parole, rather than its legality. Those arguments are more properly made to the legislative and executive branches of the government. This Court's responsibility is to ensure that the sentence mandated in this case does not contravene the Constitution, not whether Congress

made a wise choice in selecting it. As Chief Justice Marshall recognized over 150 years ago, "the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the court, which is to define a crime, and ordain its punishment." *United States v. Wiltberger,* 18 U.S. (5 Wheat.) 76, 95, 5 L.Ed. 37 (1820). *See Coker v. Georgia,* 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977) (plurality opinion); *LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir.1972), *cert. denied* 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973).

**3.** With respect to these latter two areas of inquiry, the Court noted that "it may be helpful" to perform the first comparison and lower courts "may find it useful" to conduct the second. *Id.* at 291, 103 S.Ct. at 3010.

Thus, any determination of the constitutionality of the sentence mandated by § 848(b) must begin with an analysis of the offense committed. To have convicted the defendants in this case of violating 21 U.S.C. § 848(b), the jury was required to find beyond a reasonable doubt as to each defendant that the government had proved each of the following elements: 1) that the defendant was a member of the conspiracy charged in the indictment; 2) that the conspiracy was part of a series of three or more offenses committed by the defendant in violation of the federal narcotics laws; 3) that the defendant committed the series of violations with five or more persons; 4) that the defendant obtained substantial income or resources from the series of violations; 5) that the defendant acted as a "principal administrator, organizer, or leader" of the criminal enterprise; and 6) that the enterprise received at least $10 million in gross receipts from the sale of heroin during the period from June 24, 1986, to June 23, 1987.

Before even examining the facts of this case, it is evident that to be subject to the sentence imposed by § 848(b) the defendants here had to have been engaged in extremely serious wrongdoing of a continuous nature. The statute in this case could not be more different than that successfully challenged in *Solem*. There a recidivist and chronic alcoholic was sentenced to life imprisonment without parole for passing a bad check and other nonviolent felonies. Unlike *Solem*, the statute at issue here does not involve "minor criminal conduct." *Id.* at 303, 103 S.Ct. at 3016. Rather, the challenged statute is aimed at combatting the devastating effect that the use of illegal narcotics is having on our society. To achieve this result, Congress has chosen to punish those at the top of extraordinarily successful continuing criminal enterprises with life imprisonment without parole. The purposes of imposing this penalty are evident: To deter individuals from heading such enterprises and to ensure that once convicted, such persons are never again given the opportunity to recommence their illegal activities. The overarching goal, of course, is to limit the available supply of illicit narcotics. The Second Circuit has repeatedly recognized the severity of the drug problem in this nation and has not hesitated to uphold severe sentences for defendants convicted of drug-related crimes. *See, e.g., Carmona v. Ward*, 576 F.2d 405 (2d Cir.1978), *cert. denied* 439 U.S. 1091, 99 S.Ct. 874, 59 L.Ed.2d 58 (1979).

The enormity of the offense committed by the defendants as well as the harm they visited upon their neighborhood become even clearer when the extensive evidence admitted at trial is reviewed in accordance with the analysis. In performing this analysis, the Court is guided by the inquiry performed by the Supreme Court in *Solem*. *Id.*, 463 U.S. at pp. 293–94, 103 S.Ct. at pp. 3011–12. The enterprise which the defendants headed was remarkably sophisticated. The organization operated several heroin mills, including one that functioned out of Flores' apartment, where workers would cut the heroin to the desirable purity, measure it and package it into glassine envelopes, so-called "dime bags," which were then bundled into groups of ten and held together by a rubber band. Each day, at many locations in the South Bronx, "street managers" were given a quantity of heroin to distribute to street salesmen. The enterprise branded its heroin by stamping each bag for easy recognition on the street. Telephonic communication among the workers in the enterprise was facilitated by the use of beepers.

The goal of this enterprise was the accumulation of wealth. Careful book-keeping was a hallmark of the enterprise. The three ledgers admitted into evidence at trial established that from February 25, 1987, to June 24, 1987, sales exceeded $4.6 million. Average sales were $40,000 or 4,000 "dime bags" per day. Sales climbed as high as $90,000 in one day. By the time the Torres brothers were arrested, they had amassed an empire based on heroin proceeds. They owned a multi-million dollar shopping center, bowling alleys, three gas stations, seven homes, fine jewelry including one woman's ring with a four carat diamond worth $17,000, a yacht and several

sports cars including a $156,000 Lamborghini. In addition, more than $500,000 in cash and bank checks was seized from the Torres brothers at the time of their arrest.

The intercepted telephone conversations revealed that Nelson Flores applied his considerable managerial skills in running the day-to-day operations of the enterprise. In the nature of a chief operating officer, he coordinated the wholesale purchase of heroin, managed the workers at the mills, distributed the heroin to the street managers, and maintained the books for the organization. The police recovered more than $100,000 in cash from Flores' apartment. Several hundred thousand dollars worth of pure heroin was recovered from apartments controlled by Flores. There was evidence that, in one day, he structured, coordinated and completed a wholesale transaction of over 4000 glassine bags of heroin.

Members of the enterprise were prepared to use violence to protect themselves as well as their drugs. Two fully loaded semi-automatic weapons were recovered from Flores' apartment. Numerous other weapons, as well as ammunition, were recovered from members of the conspiracy, including .357 Magnum revolvers, a 9 millimeter Luger Uzi semi-automatic rifle, and .12 gauge Mossberg shotguns.

Without doubt, the defendants were aware of the culpability of their acts. They ensured that their enterprise operated under a shroud of secrecy to avoid detection. Thus, conversations on the telephone were coded, false income statements were employed, cars were purchased in nominee names entirely with cash, and the Torres brothers employed an elaborate scheme to introduce their illegal income into the stream of legitimate commerce while evading taxes.

Victor Torres, Jorge Torres, and Nelson Flores can in no way be characterized as first offenders. Rather, in business to make a fortune, they repeated narcotics offenses every day for the duration of their participation in the conspiracy while successfully avoiding detection and arrest. Evidence was introduced at trial that the Torres brothers had been involved in the enterprise since at least the beginning of 1983 and that Flores rose to his position of seniority in 1986.

A review of sentences imposed on other defendants within the federal system confirms the conclusion that a sentence of life without parole is not disproportionate to such conduct. Numerous defendants have been sentenced to life imprisonment without the possibility of parole under § 848(a). *See, e.g., Williams v. United States,* 731 F.2d 138 (2d Cir.1984), *cert. denied* 469 U.S. 1188, 105 S.Ct. 956, 83 L.Ed.2d 963 (1985); *United States v. Sperling,* 506 F.2d 1323 (2d Cir.1974), *cert. denied* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975). Indeed, the Second Circuit has "repeatedly upheld heavy sentences for narcotics violations." *Cunningham v. Henderson,* 725 F.2d 32, 36 (2d Cir.1984). In their moving papers, defendants point to numerous federal statutes dealing with serious crimes that allow, but do not require, life imprisonment, and in some instances provide for the possibility of parole. The existence of this diversity in sentences, however, does not render § 848(b) violative of the Eighth Amendment. Congress has significant discretion to vary the sentences it legislates in accordance with perceived societal needs. An absolute hierarchical ordering of sentences is not required by the Constitution. Faced with a national drug problem as well as the urgent need to combat the effect of drugs on our society, Congress acted within its discretion in fixing the penalty for violating 21 U.S.C. § 848(b) as life imprisonment without the possibility of parole.

■ Defendants also challenge the mandatory aspect of the sentence under § 848(b). It is true that under that statute anyone convicted of the crime *must* be sentenced to life imprisonment without the possibility of parole. In arguing that this lack of sentencing discretion in the Court violates the Eighth Amendment, defendants rely, however, on capital punishment cases. Yet, while individualized sentencing is constitutionally required in death penalty cases, no such requirement exists in noncapital cases. *Sumner v. Shuman,* 483

U.S. 66, 107 S.Ct. 2716, 2722, 97 L.Ed.2d 56 (1987).

The enormity of the continuing criminal enterprise offense for which the defendants were convicted is as apparent as is its harm to society. The vast quantities of heroin they injected into the stream of commerce did not enter a vacuum. Rather, those drugs were consumed by hundreds of individuals whose debilitating addiction ensured the defendants a ready market and obscene profits. This Court is unable to conclude that the penalty of life imprisonment without the possibility of parole is "grossly disproportionate," much less disproportionate at all, to the crimes these defendants committed.

Because of the gravity of the offense in this case, the harm done to society, and the stiff sentences that have been meted out to others convicted of narcotics offenses within the federal system, the Court need not probe further into the proportionality of the sentence imposed here. We are convinced that the sentence mandated by 21 U.S.C. § 848(b) is constitutional on its face and as applied to Victor Torres, Jorge Torres, and Nelson Flores.

*Motions For Acquittal*

Defendants Flores, Rivera, Coffie, Velez, and Jorge and Victor Torres have moved, pursuant to Rule 29, for a judgment of acquittal claiming that insufficient evidence was presented to the jury on one or more counts. As the moving defendants recognize, a defendant seeking acquittal after the return of a guilty verdict faces a " 'very heavy burden.' " *United States v. Wiley*, 846 F.2d 150, 153 (2d Cir.1988) (citation omitted). Indeed, the conviction must be upheld if " 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Sigalow*, 812 F.2d 783, 785 (2d Cir.1987), quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). In considering the evidence adduced at trial, the Court must view all the evidence against the defendant, not just portions that may exculpate that defend-

ant. *United States v. Carson*, 702 F.2d 351, 362 (2d Cir.), *cert. denied* 462 U.S. 1108, 103 S.Ct. 2456, 2457, 77 L.Ed.2d 1335 (1983). Thus, the verdict "must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Applying this standard to the motions for acquittal in this case, the Court denies each motion.

### 1. *Nelson Flores*

Flores makes two arguments concerning his entitlement to acquittal of the § 848(b) offense, and each is without merit. First, Flores contends that rather than a "principal administrator, organizer or leader" as required by § 848(b), he was merely a "lieutenant or footsoldier." Second, he challenges the sufficiency of proof as to an essential element of the offense, namely that the continuing criminal enterprise gross $10 million dollars in a twelve month period. 21 U.S.C. § 848(b)(2)(B). These arguments are based on an overly narrow view of the statute as well as a failure to appreciate how a massive heroin distribution ring functions.

■ There is ample evidence to support Flores' conviction under 21 U.S.C. § 848(b). The evidence introduced at trial was sufficient to enable the jury to conclude that Flores ran the drug distribution ring's New York operations. The evidence showed that Flores was responsible for all aspects of the enterprise, including the purchase and sale of heroin, personnel decisions, managing the mills and the street managers, and record-keeping. While his role required him at times to perform menial tasks, such work is not inconsistent with his role as a principal administrator or organizer. Moreover, it is irrelevant that Flores may have been answerable to the Torres brothers. The statute contemplates that there may be several such principal administrators, organizers, or leaders, and by choosing the words "principal" "administrator" and "organizer", Congress clearly contemplated their application to someone like Flores.

■ The evidence was also sufficient to enable the jury to conclude that the enterprise earned $10 million dollars in a twelve month period. Ledgers admitted into evidence established that the enterprise had gross receipts of about $4.6 million in the four months prior to the arrests. The jury also had before it evidence that the organization was able to amass $1 million in profits on a single occasion in January 1987, that daily receipts were between $30,-000–40,000 in late 1986, that the vast wealth of the Torres brothers was not accounted for by legitimate income, and that the organization had been in existence for several years. Moreover, expert statistical testimony was presented to the jury. When taken together, the evidence was clearly sufficient to support the jury's verdict.[4] Accordingly, Flores' motion for acquittal as to § 848(b) is denied.

## 2. *Dennis Rivera* [5]

Rivera argues in his motion for acquittal that there was insufficient evidence linking him to the conspiracy, and to the cocaine and gun found in the dumbwaiter shaft adjacent to apartment # 6 at 527 East 147th Street. The Court concludes, however, that there was ample evidence to support the jury's verdict on the three counts as to which he was convicted.

Numerous intercepted telephone conversations were introduced into evidence to prove that Rivera was a member of the conspiracy, and they are sufficient to support the conclusion reached by the jury on that score. Rivera's challenge to his conviction for conspiracy is based solely on his interpretation of those wiretaps. However, while the jury was free to accept Rivera's interpretation, they choose not to. No argument is made that the interpretation urged by Rivera is the only possible one.

Accordingly, the motion for acquittal on Count One is denied.

■ Rivera's arguments with respect to Counts 13 and 17 ignore evidence that linked him to apartment # 6 as well as the dumbwaiter shaft. The jury had before it evidence that cocaine transactions occurred regularly in apartment # 6, that Rivera was frequently present in that apartment, that the access to the dumbwaiter shaft was possible solely through apartment # 6, and that the dumbwaiter door was ajar at the time of Rivera's arrest there. Taken together, this evidence amply supports the jury's verdict.

## 3. *Ray Coffie*

■ The crux of Coffie's motion for acquittal is that there is no evidence linking him to the conspiracy. Rather, he contends that any connection to the conspiracy is too tenuous and speculative to support the jury's verdict. The Court disagrees. When the evidence is viewed in the light most favorable to the government, the jury's guilty verdict is wholly supported by the record.

While there may be no "smoking gun" heroin transaction linking Coffie to the conspiracy, there is a wealth of circumstantial evidence that, when viewed together, supports the jury's conclusion and is sufficient as a matter of law to sustain the conviction. *United States v. Carson, supra.* Coffie assisted the conspiracy by providing false income statements and beepers to members of the conspiracy. Coffie's name and beeper number, while not present in certain documents maintained by the enterprise, do appear in other documents maintained by the conspiracy and admitted into evidence. The drug ledgers also reflect payments to Coffie of more than $200,000 for the services he rendered. The most damaging evidence before the jury was nu-

---

4. Flores' contention that statistical projections are *per se* inappropriate to prove actual receipts is without merit. The one case Flores relies on for this proposition is inapposite since in that case the court held that the government had insufficient evidence upon which to base their projections. *Pizzarello v. United States,* 408 F.2d 579, 584 (2d Cir.), *cert. denied* 396 U.S. 986, 90

S.Ct. 481, 24 L.Ed.2d 450 (1969). Such is not the case here.

5. Rivera was convicted of conspiracy (Count One), possession of cocaine with intent to distribute same (Count 13), and using or carrying a gun in connection with narcotics trafficking (Count 17).

merous intercepted telephone conversations from which Coffie's knowledge of the illegal purposes of the enterprise may be inferred. For example, in one such conversation, Coffie asks Flores how "business" was going. However, the only business in which Flores was engaged at the time was narcotics trafficking.

The cases Coffie cites in support of his motion are uniformly inapposite. Unlike the juries in those cases, the jury in this case had substantial evidence from which they could have reasonably concluded that Coffie was a member of the conspiracy. Coffie's supply of beepers and false income statements furthered the conspiracy, and Coffie's knowledge of its unlawful objectives is supported by the intercepted conversations.[6] Thus, even if the jury made inferences to reach its conclusion, those inferences were fully justified. Accordingly, the motion for acquittal is denied.

### 4. *Reginald Velez*

■ Velez moves for acquittal after his conviction for conspiracy (Count One), possession of narcotics with intent to distribute same (Count 11), and using or carrying a firearm in connection with narcotics trafficking (Count 14). Velez advances no arguments supporting his Rule 29 motion for Counts One and Eleven that were not already presented to and rejected by the Court. Thus, his motion as to those counts is denied.

The jury's verdict on Count 14 is fully supported by the record. Velez argues that since the only evidence of the existence of the gun was his handwritten note affixed to a ledger to the effect that he had purchased a shotgun to protect a distribution location, the evidence was insufficient to sustain his conviction. Velez, however, ignores the enterprise's strict bookkeeping practices that the Government established

at trial. To justify expenses and account for sales, members of the conspiracy submitted detailed notes and receipts to Nelson Flores detailing their activities. The ledgers admitted into evidence are replete with such documents. Moreover, it was in Velez' interest to be accurate in preparing these reports since he depended on the conspiracy for his livelihood. In addition, there was specific evidence that Velez' reports were highly accurate in fact,[7] and despite his belated post-trial assertion, not even argued to the jury, there is no proof that Velez fabricated his reports to steal from his co-conspirators. With all this evidence, the jury was permitted to conclude that Velez did indeed purchase the gun for use during drug trafficking.

Velez also contends that the conviction must be reversed since the receipt written by him was uncorroborated. However, the Second Circuit recently declared that corroboration of admissions is necessary only when there is reason to doubt the reliability of the admission. *United States v. Ianniello*, 808 F.2d 184, 195 (2d Cir.1986), *cert. denied* —— U.S. ——, 107 S.Ct. 3229, 97 L.Ed.2d 736 (1987). *Accord, Smith v. United States*, 348 U.S. 147, 155 n. 3, 75 S.Ct. 194, 198 n. 3, 99 L.Ed. 192 (1954). As in *Ianniello*, there was sufficient proof to enable the jury to credit the accuracy of Velez' admission. The admission was one of a series of reports routinely made by Velez; it was provided to a co-conspirator in furtherance of the conspiracy; and there was an incentive for Velez to be accurate in making it. Indeed, as the Second Circuit has held, such drug records are likely to be kept "with care and precision." *United States v. McGrath*, 613 F.2d 361, 368 (2d Cir.1979), *cert. denied* 446 U.S. 967, 100 S.Ct. 2946, 64 L.Ed.2d 827 (1980). Accordingly, there is no need for corroboration of

---

**6.** These facts, taken together, distinguish the cases relied on by Coffie in his moving papers. *United States v. Falcone*, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940) (conviction reversed since defendant only sold sugar to bootleggers); *United States v. Gaviria*, 740 F.2d 174, 184 (2d Cir.1984) (mere association is insufficient to establish "knowing membership" in the conspiracy); *United States v. Gallishaw*, 428 F.2d 760, 762–64 (2d Cir.1970) (conspiracy conviction re-

versed since no evidence that defendant knew the illegal purpose to which the gun he provided would be put).

**7.** The testimony at trial revealed that one of Velez's reports was extremely accurate in assessing the loss to the conspiracy resulting from the arrest one of the employees of the enterprise. Transcript at pp. 3206–07, 3211–12.

this admission, and the motion for acquittal is denied.

### 5. *Victor and Jorge Torres*

The Torres brothers' motions for acquittal advance no arguments not previously rejected. Thus, each motion is denied. The evidence presented at trial was overwhelming concerning their participation in the conspiracy and their guilt as to the other counts for which they were convicted. A detailed recitation of the evidence is unnecessary. Rather, it is sufficient to note that the Court has rarely seen so much evidence introduced in a narcotics trial. Not only did the government introduce wiretapped conversations and the testimony of two informants, but it also produced an extraordinary amount of physical evidence. Each type of evidence incriminated the Torres brothers. Confronted with this mass of evidence, the Court is unable to conclude that the jury's verdict was without support. Accordingly, their motions are denied.

### *Motions for New Trial of Flores and Coffie*

A motion for a new trial under Fed.R. Crim.P. 33 is warranted "if required in the interest of justice." This circuit, unlike some others, has not adopted a standard for measuring when the interest of justice mandates that a new trial be held. Nevertheless, even if this Court applies the generous test that the motion should be granted if the verdict is contrary to the weight of the evidence, the motions must be denied. 3 Wright, *Federal Practice and Procedure: Criminal 2d* § 553, p. 246 (1982).

### 1. *Nelson Flores*

■ Flores seeks a new trial arguing that there was insufficient evidence for the jury to conclude that he was a "principal administrator, organizer, or leader" of the criminal enterprise. As already discussed, Flores' role was similar to that of a chief operating officer. In that capacity, he was responsible for managing the day to day operations of a massive heroin conspiracy. While there was substantial evidence that Flores reported to Jorge and Victor Torres, the evidence clearly showed that Flores managed the business. Since Congress did not confine § 848(b)'s reach to principal "leaders," but extended it to principal "administrators" and "organizers," it is evident that the drafters contemplated that such principals in the latter categories could be answerable to others. In so doing, Congress must have contemplated § 848(b) liability for principal "organizers" and "administrators" who reported to "leaders". Accordingly, the Court concludes that a new trial is not warranted in this case as to Nelson Flores.

### 2. *Ray Coffie*

Coffie argues that the testimony of expert witness Sergeant Edward Monks was so prejudicial as to require a new trial. The Court disagrees, and the motion is denied.

■ First, Coffie contends that Sgt. Monks' testimony invaded the province of the jury when he opined in reference to an intercepted telephone conversation that Coffie "is part of whatever is happening, or knows what's happened to that." Tr. at p. 1789. There are several flaws to this argument. Immediately after Sgt. Monk uttered these words, the Court sustained an objection to that testimony and ordered the latter part of the testimony stricken. Further, the members of the jury were instructed at the close of the case not to substitute the experts' opinions for their "own reason, judgment and common sense," and the jury was similarly instructed immediately before Sgt. Monks commenced his direct testimony. Tr. at p. 1771–72. Finally, an expert may give his opinion on ultimate issues of fact without improperly invading the role of the jury so long as the expert does not couch his opinions in "statutory and regulatory language indicating guilt." *United States v. Scop*, 846 F.2d 135, 142 (2d Cir.), *judgment rev'd on other grounds*, 856 F.2d 5 (2d Cir.1988) ("telling the jury that a defendant ... participated in a narcotics transaction differs from opinion that the defendant 'possessed narcotics, to wit, heroin, with the intent to sell....' "). Thus, Coffie's first argument is unavailing.

Second, Coffie argues that Sgt. Monks improperly relied on the credibility of other witnesses, namely the Spanish–English interpreters of the intercepted conversations, to reach his conclusions concerning Coffie. Because Sgt. Monks does not understand Spanish, he relied on the translations of the intercepted conversations performed by government witnesses. At no time, however, did Sgt. Monks represent that he was assessing the credibility of those witnesses. Essentially, Sgt. Monks assumed, for the purpose of rendering his opinion, the accuracy of the translations. Indeed, there is no other way for an expert to testify when the original conversations are in a language not comprehensible to the expert. *See, e.g., United States v. Nersesian,* 824 F.2d 1294, 1307 (2d Cir.), *cert. denied* —— U.S. ——, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987). This scenario is quite different than *Scop* where the expert witness based his conclusions on his "positive assessment of the trustworthiness and accuracy of the testimony of the government's witness ..." *Id.*

Coffie's final argument is that Sgt. Monks testified to matters outside the scope of his competency. In qualifying the expert, the government established Sgt. Monks as an expert in understanding telephone conversations related to narcotics trafficking. As such an expert, Sgt. Monks' role was to interpret the meaning of conversations that were otherwise ambiguous, nonsensical, or laden with code words. Coffie's argument, to the extent that it seeks to limit the testimony of Sgt. Monks to the interpretation of code words alone, is untenable.

For the reasons stated above, Coffie's motion for a new trial is denied.

### Conclusion

The defendants' post-trial motions are denied. Accordingly, their convictions stand.

SO ORDERED.